UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT FILER,<br><br>                Plaintiff,<br><br>    v.<br><br>THE CITY OF NEW YORK, DETECTIVE CRAIG BIER, DETECTIVE JAMES ZOZZARO, and OFFICER MATTHEW VORRARO,<br><br>                Defendants. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>14 Civ. 5672 (PKC)(LB) |

## PRELIMINARY STATEMENT

1. This is a civil rights action seeking damages and injunctive relief from Defendants, the City of New York, Detective Craig Bier, Detective James Zozzaro and Officer Matthew Vorraro (collectively, "Defendants"), for Defendants' violations of Plaintiff Robert Filer's rights under the federal Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et. seq.* ("NYCHRL"), and pursuant to 42 U.S.C. § 1983 ("Section 1983").

2. Plaintiff Robert Filer is 29 years old. He is a person with a disability. Mr. Filer is paralyzed from the chest and waist area down. He cannot walk and exclusively uses a wheelchair or motorized scooter for mobility. He also cannot hold himself upright without assistance. Among other devices that accommodate his disability, Mr. Filer requires a catheter to urinate. Over the course of 38 hours, beginning on November 19, 2011, the New York City Police Department ("NYPD") arrested, transported and detained Mr. Filer in a discriminatory,

1

inaccessible and dangerous way that failed to accommodate Mr. Filer's disability, caused him pain, injury and humiliation, and violated his rights.

3. Following his arrest by the NYPD, officers carried Mr. Filer and placed him into a police van that was neither designed nor retrofit to accommodate wheelchair users. Although Mr. Filer is paralyzed and thus cannot hold himself upright without assistance, NYPD officers failed to secure Mr. Filer in the vehicle using a seatbelt or any other means. Officers then transported Mr. Filer to the 113th Precinct in the police van. During transport, Mr. Filer was thrown to the floor of the police van by the motion of the vehicle. He repeatedly hit the floor and bottoms of the van's seats. As a result, Mr. Filer felt pain in his head, neck and upper back. Mr. Filer's catheter also came loose, soaking his clothing and body in urine.

4. When the officers brought Mr. Filer into the 113th Precinct, the holding cells were too small to accommodate his wheelchair. As a result, NYPD officers chained Mr. Filer to a bar attached to the wall. He remained chained to this wall for the majority of his approximately 38-hour detention at the precinct. Mr. Filer was given a Gatorade bottle to empty his catheter, and was denied access to a toilet to empty the device. Chained to the wall, Mr. Filer was unable to adjust himself or to move around, which is necessary to prevent sores and related complications.

5. Today, more than 25 years after the passage of the Americans with Disabilities Act, the City of New York still fails to provide accessible vehicles when a person who uses a wheelchair is arrested, detained or transported by NYPD personnel. The City of New York also fails to offer adequate training, policies and procedures to govern situations where a person who uses a wheelchair is arrested and must be transported. When it arrested, transported and detained Mr. Filer for over 38 hours, beginning on November 19, 2011, the NYPD used discriminatory, inaccessible and dangerous methods. As a result, Mr. Filer experienced discrimination, pain,

humiliation and indignity. By refusing to provide accessible services, the NYPD discriminated against Mr. Filer, adding an additional layer of punishment, injury and indignity to the arrest and detention process, solely because of Mr. Filer's disability.

6. Mr. Filer brings this action to compel Defendants to do what the ADA, Section 504, Section 1983, and the NYCHRL require: to provide safe and accessible vehicles and services for arrestees who use wheelchairs. Plaintiff seeks declaratory and injunctive relief, damages and reasonable attorneys' fees and costs, pursuant to applicable federal and local laws.

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201, 42 U.S.C. § 12132 *et seq.*, 29 U.S.C. § 794, and 42 U.S.C. § 1983.

8. The Court has supplemental jurisdiction over Plaintiff's local law claims pursuant to 28 U.S.C. § 1367, because the federal and local law claims arise from a common nucleus of operative fact.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred herein.

## PARTIES

10. Plaintiff Robert Filer is a citizen of the United States and is a qualified individual with a disability under federal law. He currently resides in Attica, New York, where he is detained at the Wyoming Correctional Facility ("Wyoming").

11. Mr. Filer is a lifelong resident of Jamaica, Queens, New York, where he lived with his parents and sisters prior to his incarceration. Mr. Filer's parents retrofitted their family home to accommodate Mr. Filer's disability. He also has a daughter who is a lifelong resident of Queens.

When Mr. Filer is released from Wyoming, he will be under parole supervision in Queens. Mr. Filer has a criminal history and was arrested again by the NYPD between the incident giving rise to this Complaint and the filing of this action. Based on his prior encounters with the NYPD, Mr. Filer is concerned that the NYPD will target him upon his release from Wyoming. All events giving rise to this Complaint occurred in the State of New York, County of Queens, during Mr. Filer's encounter with the NYPD.

12. Defendant City of New York is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. At all times relevant hereto, Defendant City of New York, acting through the NYPD, was responsible for the policy, practice, supervision, implementation and conduct of all NYPD matters and was responsible for the appointment, training, supervision and conduct of all NYPD personnel, including the Defendants referenced herein. In addition, at all relevant times, Defendant City of New York was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States and the State of New York. The City of New York and the NYPD received federal financial assistance at all times relevant to this Complaint.

13. At all times relevant hereto, Defendant Detective Craig Bier was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such. Detective Bier is being sued in his individual capacity.

14. At all times relevant hereto, Defendant Detective James Zozzaro was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such. Detective Zozzaro is being sued in his individual capacity.

15. At all times relevant hereto, Defendant Officer Matthew Vorraro (together with Detective Bier and Detective Zozzaro, the "Individual Defendants") was a police officer in the NYPD acting in the capacity of agent, servant and employee of Defendant City of New York, and within the scope of his employment as such. Officer Vorraro is being sued in his individual capacity.

## FACTUAL ALLEGATIONS

### I.    Mr. Filer's Disability

16. Plaintiff Robert Filer has a visible physical disability.

17. In 2006, when he was 19 years old, Mr. Filer suffered a spinal cord injury and was diagnosed as having T-6 paraplegia. T-6 refers to the location of Mr. Filer's injury, which is at the sixth thoracic vertebra.

18. As a result of Mr. Filer's injury, he is paralyzed from the chest and waist area down, can no longer walk, and requires a wheelchair or motorized scooter for mobility.

19. Mr. Filer also lost bladder function as a result of his paralysis. He is required to use a catheter and related devices to urinate approximately every one and a half to two hours to avoid spillage, overflow and infections.

20. Mr. Filer is a qualified individual with a disability, as defined by the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C.A. § 794(a). He also has a disability as defined by § 8-102(16)(a) of the NYCHRL.

21. Upon information and belief, all officers responsible for Mr. Filer's arrest, transport and detention, including Defendant Officers Bier, Vorraro and Zozzaro, were aware of Mr. Filer's visible physical disability.

## II.     Mr. Filer's Arrest

22. On November 19, 2011, a number of NYPD officers, including Officers Bier, Vorraro and Zozzaro, arrested Mr. Filer in Jamaica, Queens, New York, at approximately 9:30 p.m.

23. At the time of his arrest, Mr. Filer was seated in the driver's seat of his parked vehicle. His car was retrofit to allow him to operate it with his hands only.

24. Officers, including Officers Vorraro and Zozzaro, removed Mr. Filer's wheelchair from the trunk of his car with the assistance of his passenger, lifted Mr. Filer out of his car, and put Mr. Filer in his wheelchair.

25. Officers Vorraro and Zozzaro searched Mr. Filer, placed him under arrest, and handcuffed Mr. Filer behind his back.

26. Mr. Filer was not charged with resisting arrest.

27. Officers Vorraro and Zozzaro did not draw their weapons at any point during Mr. Filer's arrest because the arresting officers "had it under control."

28. Officers Vorraro and Zozzaro also did not place Mr. Filer on the ground at any point during his arrest because the arresting officers "had it under control."

## III.    NYPD Officers Transported Mr. Filer in a Dangerous and Inaccessible Manner

29. An NYPD van arrived at the scene of the arrest to transport Mr. Filer to the 113th Precinct.

30. Mr. Filer was not able to transfer from his wheelchair into the NYPD van because the van's door was high up from the ground and the van did not have a wheelchair accessible entrance.

31. Instead, four NYPD officers, including Officers Bier, Vorraro and Zozzaro, picked Mr. Filer up out of his wheelchair by his legs, back and arms, carried him to the police van, and attempted to lift him inside.

32. The four NYPD officers, including Officers Bier, Vorraro and Zozzaro, repeatedly tried to place Mr. Filer into the van, but they were not able to do so because there was not enough space for all four officers to fit inside the vehicle.

33. Two officers, Officers Vorraro and Zozzaro, were eventually able to lift Mr. Filer and carry him into the NYPD van.

34. The officers, including Officers Vorraro and Zozzaro, placed Mr. Filer in a seat in the first passenger row of the van.

35. Once Mr. Filer was placed inside the van, the officers, including Officers Vorraro and Zozzaro, did not seatbelt or otherwise secure Mr. Filer, and his arms remained handcuffed behind his back.

36. Two police officers, Officers Vorraro and Zozzaro, transported Mr. Filer in the van to the 113th Precinct: one police officer drove the van and one officer sat in the front passenger seat.

37. Once the vehicle was in motion, Mr. Filer was unable to hold himself upright due to his disability.

38. As the van made its way to the precinct, Mr. Filer fell to the floor of the van.

39. Mr. Filer repeatedly hit his head, neck, and body as the van braked, turned corners, sped up, slowed down, stopped, started, and went over potholes and other bumps in the streets.

40. At one point during the ride, the passenger officer pulled Mr. Filer up from the floor of the van, and placed him back down on the seat.

41. Mr. Filer's head and neck continued to bump up and down on the seat for the remainder of the transport.

42. Mr. Filer repeatedly requested assistance and alternative transportation to accommodate his disability.

43. NYPD officers, including Officers Vorraro and Zozzaro, never provided Mr. Filer with either alternative transportation or an accommodation for his disability, and instead told him he would be "fine," to "hold on," and that they would arrive at the precinct soon.

44. Mr. Filer felt pain in his head, neck and upper back as a result of this incident.

45. Mr. Filer's catheter also came loose during transport, soaking his clothing and body in urine.

## IV.   The 113th Precinct was Physically Inaccessible to Mr. Filer

46. When the van arrived at the 113th Precinct, multiple officers, including Officers Bier, Vorraro and Zozzaro, carried Mr. Filer out of the vehicle and put him in his wheelchair.

47. Officers including, upon information and belief, Officers Bier, Vorraro and Zozzaro, carried Mr. Filer in his wheelchair from the street, over the curb and onto the sidewalk.

48. Inside the 113th Precinct, the holding cells were not wide enough for Mr. Filer's wheelchair to fit inside.

49. Instead, officers handcuffed Mr. Filer to a bar that was attached to a wall outside of the holding cells for the majority of his approximately 38-hour detention at the precinct.

50. During his detention at the 113th Precinct, because of the manner in which he was restrained outside of a holding cell, Mr. Filer was unable to adjust himself, move around or lay down, which he is required to do because of his disability and in order to prevent sores, clots and infection.

51. Mr. Filer also requires a catheter to urinate due to his disability, and must empty the device approximately every one and a half to two hours to avoid spillage, overflow and infection.

52. Mr. Filer must also use urinal bottles to empty his catheter. However, instead of a sanitary urinal bottle, officers at the 113th Precinct gave Mr. Filer an empty Gatorade bottle.

53. Because Mr. Filer was restrained outside of a holding cell, he was not able to use the bathroom at will and was instead reliant on the officers to permit him to do so.

54. The bathroom that officers at the 113th Precinct took Mr. Filer to use was not physically accessible to him, including the bathroom stall and sink areas.

55. Upon information and belief, NYPD detainees at the 113th Precinct who do not use wheelchairs are detained in holding cells where they are able to adjust themselves, move around, lay down, and have access to a toilet and sink within the holding cell.

56. Mr. Filer repeatedly requested accommodations and medical attention, but NYPD personnel told Mr. Filer he would be fine and would be out of there soon.

57. Mr. Filer eventually returned home on November 20, 2011, over 38 hours after his encounter with the NYPD began.

58. Mr. Filer experienced pain in his neck, head, and upper back during the NYPD's transport, while he was detained at the 113th Precinct, and after he returned home.

59. Mr. Filer's clothing was soaked in his own urine until he had the opportunity to change at the 113th Precinct. Mr. Filer smelled of urine until he returned home and was able to clean himself.

60. During his encounter with the NYPD beginning on November 19, 2011, Mr. Filer repeatedly experienced discrimination, pain, indignity, inaccessibility and services that were not adequate to accommodate, protect, or ensure the safety of a person who uses a wheelchair.

## V.     The NYPD has a Pattern and Practice of Failing to Accommodate Arrestees or Detainees Who Use Wheelchairs During Transports

61. The City of New York routinely fails to provide appropriate and accessible vehicles when a person who uses a wheelchair is arrested, detained or transported by NYPD personnel.  The City also fails to offer adequate training and policies or procedures to govern situations where a person who uses a wheelchair is arrested and needs to be transported.

62. The City of New York does not have a written anti-discrimination policy concerning how NYPD personnel are to appropriately interact with and accommodate people who use wheelchairs when they are arrested and need to be transported.

63. The City of New York does not have any wheelchair accessible vans within the fleet of vehicles the NYPD uses to transport arrestees or detainees.

64. Accessible vans for wheelchair users have features such as very wide doors, ramps on a safe slope into the vehicle, barriers on the sides of the ramp to ensure stability, and devices to secure the person inside the van.

65. Publicly available information chronicles numerous incidences of the NYPD's unsafe interactions with people who use wheelchairs.  These incidents demonstrate the City of New York's pervasive pattern and practice of providing physically inaccessible NYPD services and facilities, as well as insufficient training and policies and procedures for NYPD personnel.

66. In a 2002 action in the United States District Court for the Eastern District of New York ("EDNY"), Donald D. Davis, a wheelchair user, alleged that officers refused to transport his wheelchair with him at the time of his arrest.  Mr. Davis further alleged that arresting officers told him that he did not need a wheelchair.

67. In a 2003 to 2004 action in the United States District Court for the Southern District of New York ("SDNY"), Ann Stauber, a 61-year-old wheelchair user, alleged that an officer

10

refused to allow her access to a bathroom and "grabbed her wheelchair and spun it around, damaging its controls in the process."

68. In a 2007 EDNY action, Devin Sayers, a wheelchair user, alleged that he sustained injuries "when, seated in his wheelchair, he fell backwards while riding in the back of a police van."

69. In a 2009 SDNY action, William L. Joyner, a wheelchair user, alleged that "officers took [him] out of [his] wheelchair and did not have a wheelchair police van" during an arrest.

70. A 2012 article in the New York Observer describes an incident involving Larry Wagner, a Vietnam War veteran and wheelchair user, who was arrested and transported in a police van. According to Mr. Wagner, officers did not allow him to bring his wheelchair to the precinct. A spokeswoman for the NYPD declined to comment on this story.

71. In 2012, NYPD officers had difficulty transporting arrestees who used wheelchairs to the precinct from an Occupy Wall Street Disability Caucus protest outside of Gracie Mansion. This protest coincided with an anniversary event celebrating the Americans with Disabilities Act.

72. A 2014 New York Times article describes an incident involving Fredrick Brennan, a 19-year-old wheelchair user, who was stranded in the snow and developed hypothermia after NYPD officers' indifference to his disability. The article describes both the physical inaccessibility of the NYPD precinct and that Mr. Brennan "was told the police did not have a van with a lift for the chair." A police spokeswoman is noted as responding to the reporter's inquiries and indicating "we should have done a better job of getting him to his destination."

73. Upon information and belief, there are numerous other incidents in which the NYPD's discriminatory conduct violates the protections afforded to people who use wheelchairs under the

11

ADA, Section 504, other federal and local anti-discrimination laws, and the United States Constitution.

74. These incidents, together with Mr. Filer's encounter with the NYPD beginning on November 19, 2011, demonstrate that the NYPD is not in compliance with federal and local law, routinely discriminates against people who use wheelchairs, and neglects the unique safety concerns of this population.

75. The City of New York has failed to implement NYPD training, practices and policies and procedures that accommodate and ensure the safety of people who use wheelchairs when they encounter the NYPD and require transport.

76. The City of New York and the NYPD, including relevant policymakers, were and are aware of past incidents in which NYPD officers had difficulty providing services to individuals who use wheelchairs when they require transport.

77. However, despite this knowledge, the City of New York has failed to adopt training, practices and policies and procedures sufficient to accommodate and safely arrest, transport and detain people who use wheelchairs in a way that accounts for their disabilities and is not discriminatory.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Discrimination in violation of Title II of the Americans with Disabilities Act
(42 U.S.C. § 12132 *et seq*.)**

**Against Defendant, City of New York**

78. Plaintiff Robert Filer restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

79. Under Title II of the ADA, it is illegal for public entities to discriminate against qualified individuals with disabilities. Under 42 U.S.C. § 12132, "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."

80. At all times relevant to this action, Mr. Filer has been paralyzed from the chest and waist area down and has required a wheelchair for mobility.

81. Mr. Filer is a "qualified individual with a disability" under the ADA because his paralysis "substantially limits one or more major life activities," as defined by 42 U.S.C. § 12102(2).

82. Defendant City of New York is a "public entity," as defined by 42 U.S.C. § 12131(1).

83. Defendant City of New York unlawfully discriminated against Mr. Filer in violation of the ADA by failing to accommodate Mr. Filer's qualified disability during his arrest, transport and detention at the 113th Precinct.

84. By refusing to provide accessible services, the NYPD discriminated against Mr. Filer, adding an additional layer of punishment, injury and indignity to the arrest, transport and detention processes solely because of Mr. Filer's disability. A person who does not have a disability would not otherwise have experienced this harm.

85. Accordingly, Mr. Filer was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

## **SECOND CLAIM FOR RELIEF**
**Discrimination in violation of Section 504 of the Rehabilitation Act**
**(Title 29 U.S.C. § 794 *et seq*.)**

**Against Defendant, City of New York**

86. Plaintiff Robert Filer restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

87. Section 504 provides that it is illegal for "any program or activity receiving Federal financial assistance" to subject any "qualified individual with a disability" to discrimination under 29 U.S.C.A. § 794(a).

88. At all times relevant to this action, Mr. Filer has been paralyzed from the chest and waist area down and has required a wheelchair for mobility.

89. Mr. Filer is thus a "qualified individual with a disability" under Section 504, as defined by 29 U.S.C.A. § 705(20) and 42 U.S.C.A. 12102(2).

90. At all times relevant to this action, both Defendant City of New York and their agency, the NYPD, received funding from the federal government of the United States and were "programs or activities," as defined by 29 U.S.C.A. § 794(b).

91. Defendant City of New York unlawfully discriminated against Mr. Filer in violation of Section 504 by failing to accommodate Mr. Filer's qualified disability during his arrest, transport and detention at the 113th Precinct.

92. The NYPD's conduct during Mr. Filer's arrest, transport and detention added an additional layer of punishment, injury and indignity that a person who does not have a disability would not otherwise experience.

93. Accordingly, Mr. Filer was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

### THIRD CLAIM FOR RELIEF
### Violation of Civil Rights
### (Title 42 U.S.C. § 1983)
### Against all Individual Defendants

94. Plaintiff Robert Filer restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

95. This claim for relief is brought against each and every Individual Defendant.

96. The Individual Defendants were, at all times relevant hereto, officers of the New York City Police Department. Furthermore, all of the Individual Defendants' conduct throughout Mr. Filer's 38-hour arrest, transport, and detention was performed under the color of New York state law.

97. Mr. Filer is paralyzed from the chest and waist area down, can no longer walk, is unable to sit upright without assistance, and is required to use a catheter to urinate because of his disability. Mr. Filer's visible physical disability constitutes a serious medical condition, and both his wheelchair and catheter devices are medical necessities.

98. The Individual Defendants knew of and disregarded Mr. Filer's visible physical disability, and the corresponding excessive risks to Mr. Filer's health and safety by arresting, transporting and detaining him in an inaccessible and dangerous manner that did not accommodate his disability, failed to protect him, and threatened him serious harm.

99. The Individual Defendants were deliberately indifferent to Mr. Filer's serious medical condition during his dangerous and inaccessible arrest, transport and detention by the NYPD.

100. By their conduct alleged above, the Individual Defendants deprived Mr. Filer of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, and other federal laws. The Individual Defendants' conduct manifested deliberate indifference to Mr. Filer's constitutional and federal rights.

101. Accordingly, Mr. Filer was harmed as a direct result of the Individual Defendants' unlawful, unconstitutional and discriminatory conduct, and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

**FOURTH CLAIM FOR RELIEF**
**Violation of Civil Rights**
**(Title 42 U.S.C. § 1983)**
**(Municipal Liability Against Defendant, City of New York)**

102. Plaintiff Robert Filer restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

103. Defendant City of New York has no written policy in place concerning how its employees transport people who use wheelchairs. In fact, the current NYPD Patrol Guide provides officers with scant guidance regarding how to transport people who use wheelchairs.

104. It was highly predictable that NYPD personnel would encounter and transport people who use wheelchairs in New York City. Consequently, Defendant City of New York knew to a moral certainty that NYPD personnel would encounter and transport people who use wheelchairs.

105. It continues to be highly predictable that NYPD personnel will encounter and transport people who use wheelchairs in New York City. Consequently, Defendant City of New York

16

knows to a moral certainty that NYPD personnel will continue to encounter and transport people who use wheelchairs.

106. In fact, Defendant City of New York has notice of numerous complaints in which NYPD officers allegedly violated the rights of people who use wheelchairs during transport.

107. Furthermore, Defendant City of New York knows that the NYPD's policies and methods for transporting people who use wheelchairs are insufficient because there is a history of NYPD officers having difficulty, mishandling, and failing to accommodate people who use wheelchairs during transport. Defendant City of New York has consequently long been aware that the NYPD's failures would result, and will continue to result, in the deprivation of individual wheelchair users' constitutional and federal rights.

108. Defendant City of New York's deliberate choice to ignore the known problems with NYPD officers providing transport to people who use wheelchairs, and the City of New York's failure to implement an adequate policy or practice to guide its officers in the NYPD concerning how to transport arrestees who use wheelchairs resulted in the violation of Mr. Filer's rights secured by the Fourth and Fourteenth Amendments and the ADA. The NYPD's customs and practices for transporting people who use wheelchairs are discriminatory and dangerous.

109. The City of New York also failed to adequately train, monitor and supervise its employees regarding their constitutional and federal duty, despite the NYPD's history of encounters with people who use wheelchairs and the predictability that NYPD personnel would continue to encounter and transport people who use wheelchairs in New York City.

110. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Filer was subjected to the conduct alleged herein, Defendant City of New York has deprived Mr. Filer of rights, remedies, privileges and immunities guaranteed to

every citizen of the United States secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, and other federal laws.

111. Accordingly, Mr. Filer was harmed as a direct result of Defendants' unlawful, unconstitutional and discriminatory conduct, and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

## FIFTH CLAIM FOR RELIEF
### Discrimination in violation of the New York City Human Rights Law
### (N.Y.C. Admin. Code § 8-101 *et. seq.*)

### Against All Defendants

112. Plaintiff Robert Filer restates and incorporates by reference the preceding paragraphs above as if set forth fully herein.

113. This claim for relief is brought against each and every Defendant.

114. The NYCHRL provides that "it shall be unlawful discriminatory practice for any . . . place or provider of public accommodation" to discriminate against a person with a disability either directly or indirectly under § 8-107(4).

115. At all times relevant to this action, Mr. Filer has been paralyzed from the chest and waist area down and has required a wheelchair for mobility.

116. Mr. Filer has a "disability" as defined by § 8-102(16)(a) of the NYCHRL because he has multiple "physical impairments" to his body.

117. Defendant City of New York, and their agency the NYPD, are "persons" as defined by § 8-102(1), "covered entities" as defined by §8-102(17), and "places and providers of public accommodation" as defined by § 8-102(9).

118. Individual Defendants are "agents" and "employees" of a public accommodation as defined in § 8-107(4).

119. Defendant City of New York and all Individual Defendants unlawfully discriminated against Mr. Filer by failing to accommodate Mr. Filer's disability during his arrest, transport, and detention at the 113th Precinct in violation of the NYCHRL.

120. Furthermore, the NYPD's conduct during Mr. Filer's arrest, transport and detention added an additional layer of punishment and indignity that a person who does not have a disability would not otherwise experience.

121. Accordingly, Mr. Filer was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

## DEMAND FOR JURY TRIAL

Plaintiff Robert Filer hereby demands a trial by jury pursuant to Fed. R. Civ. P. 38.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Robert Filer respectfully requests that this Court:

a. Declare that Defendants have violated their obligations under the ADA, Section 504, Section 1983, and the NYCHRL;

b. Order appropriate injunctive relief against Defendants, including, but not limited to providing wheelchair accessible vehicles and services in connection with the arrest and transport processes, and appropriate policies, training, and procedures governing the same;

c. Award such damages to Plaintiff Robert Filer, as will fully compensate him for the loss of his rights, as well as for the harm and indignity that he experienced due to Defendants' discriminatory conduct;

d. Award Plaintiff's reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

e. Grant any other and further relief as this Court may find just and proper.


Dated: May 20, 2016
New York, NY

    NEW YORK LAWYERS FOR THE
    PUBLIC INTEREST


By:   /s/ Maureen Belluscio_____
    Maureen Belluscio
    Katherine Rosenfeld

    151 W. 30th Street, 11th Fl.
    New York, New York 10001
    (212) 244-4664


MAYER BROWN


By:   /s/ Henninger S. Bullock_____
    Henninger S. Bullock

    1221 Avenue of the Americas
    New York, NY 10020
    (212) 506-2528

*Attorneys for Plaintiff*